## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 00-10748

**JESSE C. BANNISTOR, LARRY A. BENBERRY, KARL BRADFORD, WILLIAM J. BREWER, WILLIAM C. BROWN, et al.**,

Plaintiffs-Appellees,

v.

**GARY ULLMAN, and TOM VILLANO**,

Defendants-Appellants,

**BANKERS TRUST NEW YORK CORPORATION; BT CAPITAL PARTNERS, INC.; SPHINX GRAPHIC VENTURES, INC.; PYRAMID VENTURES INC.; and JAMES M. DWORKIN**;

Appellants.

Appeal from the United States District Court
for the Northern District of Texas

April 2, 2002

Before EMILIO M. GARZA and PARKER, Circuit Judges, and HINOJOSA,[*] District Judge.

ROBERT M. PARKER, Circuit Judge:

Appellants appeal the judgment of the district court imposing fiduciary liability under the

---

[*] District Judge for the Southern District of Texas, sitting by designation.

Employment Retirement Income Security Act ("ERISA"). Although some of the district court's conclusions are erroneous and thereby vacated or modified, we ultimately affirm the judgment based on Appellants' status as "fiduciaries" under ERISA. We also affirm the award of attorney's fees in favor of Appellees. However, because there is no finding or conclusion on whether Appellees' damages should be reduced by the amount of a settlement reached between Appellees and a co-defendant, we remand this action to the district court for such determination.

I.

Appellees were employees of Colotone-Riverside, Inc., which was later renamed Charter Graphics Services, Inc. ("Debtor"). Colotone Imaging, Inc. ("Colotone"), Debtor's "sister" corporation, owned all of Debtor's stock. Sphinx Graphic Ventures, Inc. ("Sphinx"), owned all of Colotone's stock. Pyramid Ventures ("Pyramid") owned a majority-shareholder interest in Sphinx. BT Capital Partners, Inc. ("BT Capital") acted as an advisor to Pyramid, and Pyramid and BT Capital were both second-tier, wholly-owned subsidiaries of Bankers Trust New York ("BTNY"). BTNY operated its private-equity-investment business through BT Capital and BT Investment Partners, Inc. ("BTIP"). BTIP, which is not a party to this action, managed BTNY's private-equity investments by advancing funds to Pyramid for eventual investment in Debtor. From March 1994 to December 1995, BT Capital employed James Dworkin, who served on the board of directors of Sphinx, Colotone, and Debtor. Dworkin also served as Debtor's assistant secretary. For the purposes of this appeal, "BT Appellants" collectively refers to BTNY, BT Capital, Pyramid, Sphinx, and Dworkin. In Summer 1995, Gary Ullman was hired as Debtor's acting president and chief executive officer, and Tom Villano, who was Colotone's chief financial officer, was reassigned as Debtor's acting CFO. Ullman and Villano are collectively referred to as "Officer Appellants."

2

In financing the BT Appellants' acquisition of Debtor through Pyramid, Sphinx, and Colotone, Dworkin, on behalf of the BT Appellants and as Debtor's officer, negotiated, executed, and implemented a loan between Debtor and Gibraltar Financial Corp. ("Gibraltar") by which Debtor would pledge its accounts receivable to Gibraltar in exchange for the loan and a revolving line of credit, and by which Gibraltar obtained a lien on Debtor's assets in the event of a default. Under the loan Debtor's accounts receivable were collected in a "lockbox" controlled by Gibraltar, which would apply the accounts receivable to the outstanding balance of the loan and then re-advance funds to Debtor under a formula based on the value of its collateral. Once Debtor received such funds, Debtor paid its expenses, including its employees' payroll. The Officer Appellants were hired after this arrangement was implemented and had nothing to do with its negotiation and implementation.

Debtor offered its employees a 401(k) plan and a self-insured, health-benefit plan. When a payroll period ended, ADP, a payroll administrator, supplied Debtor with a report of the employees' 401(k)- and health-plan contributions. The 401(k) plan contributions were vouchered through Debtor's accounts payable system, and the amounts were forwarded to the 401(k) plan trustee[1] for contribution to each employee's plan once Debtor received sufficient funds from Gibraltar. Because the health plan was self-insured, Debtor paid health claims as an expense through a third-party administrator, Health Choice of Connecticut. The employee contributions were not separately deposited in a trust account, but were treated as accounting offsets against the health claims that Debtor had already paid.

In Fall 1995, Debtor's business suffered, and Debtor became insolvent by December.

---

[1] While Appellants state the existence of a trustee for the 401(k) plan, the bankruptcy court concluded that there was no trust account. Appellants do not challenge this conclusion.

Dworkin, representing the BT Appellants, informed Gibraltar that the BT Appellants would no longer invest in Debtor, and that as a lienholder it could either continue to fund Debtor's operations or cease its operations and foreclose on the lien. Dworkin told Villano to "make sure you take care of the employees," 7 Supp. R. at 1968, but because of Debtor's insolvency, Appellees' 401(k) and health plan contributions made in November and December were not forwarded or applied to the plans. The Officer Appellants were able to secure some funds from Gibraltar to operate Debtor while exploring the possibility of selling it, but no buyer was found. Debtor ultimately shut down operations on January 4, 1996, without forwarding approximately $30,000 in 401(k) contributions to the plan and without paying $176,000 in health claims made pursuant to the health plan. Debtor filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

Appellees originally brought this action pursuant to ERISA §§ 404(a)(1) and 405(a)(1), 29 U.S.C. §§ 1104(a)(1) & 1132(a), against Appellants and Gibraltar in the district court, but the action was referred to the bankruptcy court under 28 U.S.C. § 157(a), because it related to Debtor's bankruptcy action. Appellees alleged, *inter alia*, that Appellants violated ERISA by breaching their fiduciary duties in relation to plan assets. Appellees settled their claims with Gibraltar on January 5, 1998, for $100,000. The bankruptcy court tried the action and submitted proposed findings of fact and conclusions of law, imposing liability on Appellants for breach of ERISA fiduciary duties. Because this action was not a core-proceeding and because Appellants objected to the bankruptcy court's entry of final judgment, the bankruptcy court on June 3, 1998, transmitted the findings and conclusions to the district court for *de novo* review. Appellants filed timely objections to the findings and conclusions.

On September 8, 1999, the district court entered a one-page order adopting the findings and

conclusions and overruling Appellants' objections. The order stated that the district court reviewed the record, the findings and conclusions, and Appellants' objections, but did not state any detailed reasons for such adoption, and instead of entering a final judgment, the district court remanded the action to the bankruptcy court for further proceedings. Pursuant to FED. R. CIV. P. 59 and 60, Appellants filed a motion to alter or amend or for relief from the order. The district court referred that motion to a magistrate judge for report and recommendation. The magistrate judge recommended denial of the motion because there was no entry of a final judgment, and the district court adopted the recommendation and denied the motion. Thereafter, on January 25, 2000, the district court entered a final judgment for Appellees for the reasons stated in the bankruptcy court's findings and conclusions.

On February 4, 2000, Appellants filed a renewed motion to alter or amend judgment or for relief from judgment, and the district court again referred the motion to the magistrate judge. On June 6, 2000, the magistrate judge recommended denial of the motion on its merits. On June 12, 2000, before Appellants filed any objections, the district court entered an order adopting the recommendation and denying the motion. Then, on June 16, 2000, Appellants filed objections to the magistrate's recommendation. Appellants also filed notices of appeal on July 11, 2000. Eventually on July 17, 2000, the district court entered an order overruling Appellants' objections.

## II.

### A.

Appellants initially argue that the district court failed to conduct *de novo* review of the bankruptcy court's findings and conclusions as required by 28 U.S.C. § 157(c)(1), which provides that

5

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

Appellants assert that the district court's entry of an order adopting the findings and conclusions and erroneously remanding the action to the bankruptcy court indicates a failure to conduct *de novo* review. They also argue that the district court's reference of their post-judgment motions to a magistrate judge and adopting her report before reviewing their objections further suggests such failure and thwarts the purpose of § 157(c)(1).

While we note that the district court's orders were flawed, we ultimately cannot agree with Appellants that the district court failed to conduct *de novo* review under § 157(c)(1). It is clear that a district court must consider the record and not merely the report and recommendations of a magistrate or bankruptcy judge. *See, e.g.*, *United States v. Elsoffer*, 644 F.2d 357, 358 (5th Cir. 1981). But in *Longmire v. Guste*, 921 F.2d 620 (5th Cir. 1991), we stated:

The district court's order stated that "[f]or the reasons set forth in the Magistrate's Report to which an objection was filed; IT IS ORDERED that . . . the defendant's motion for summary judgment be granted." We cannot say that this language indicates a failure to make a de novo review of the magistrate's report, the record, and plaintiff's objections. In granting a motion for summary judgment, the district court would be required to engage in exactly the same method of analysis as employed by the magistrate. *We assume that the district court did its statutorily commanded duty in the absence of evidence to the contrary.* Therefore, we decline to reverse the district court on these grounds.

*Id.* at 623 (alterations in original) (emphasis added). Therefore, a district court's statement that it conducted *de novo* review is presumptively valid, if not dispositive. *See id.*; *see also Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000) ("The district court specified in its final judgment that it had

reviewed the entire record. Absent evidence to the contrary, this court is compelled to believe that the district court performed this duty."); *Lara v. Johnson*, 141 F.3d 239, 241 (5th Cir.) ("This court presumes that the district court followed the law and did its statutorily commanded duty."), *modified*, 149 F.3d 1226 (5th Cir. 1998) (per curiam); *Koetting v. Thompson*, 995 F.2d 37, 30 (5th Cir. 1993); *see also Home Fed. Savs. & Loan Ass'n, Inc. v. Dillon Constr. Co. (In re Dillon Constr. Co.)*, 922 F.2d 495, 497 (8th Cir. 1991).

We believe that the district court performed its statutory duty. The district court's order adopting the bankruptcy court's report expressly states that the court reviewed the record, report, and Appellants' objections. R. at 121. Appellants offer no evidence that the district court did not consider the record as expressly stated, and we decline to look behind the district court's plain statement of its decision.

Likewise, while the district court's reference of Appellants' motions to a magistrate judge are unusual, we do not hold that such reference amounts to reversible error in this action. There is no authority that precludes the reference of Rule 59 motions to magistrate judges, and this court has permitted district courts to refer Rule 60 motions to magistrate judges for report and recommendation under 28 U.S.C. § 636(b)(3). *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 925 F.2d 853, 856 (5th Cir. 1991). Also, while the district court prematurely adopted the magistrate judge's first report before Appellants filed objections, reversal is unnecessary under these facts. Appellants cite *McGill v. Goff*, 17 F.3d 729, 731 (5th Cir. 1994), in stating that the "failure to allow parties the opportunity to object to a magistrate judge's recommendation has previously been reviewed as not being the correct procedure," Appellants' Br. at 18, but they fail to mention that in *McGill* we specifically held that the district court's adoption of the magistrate's report before the parties filed

7

objections was *not* automatically reversible *and* was harmless because the appellants suffered no prejudice. *McGill*, 17 F.3d at 731. *McGill* held that such adoption was not reversible error because (1) the appellants could not establish that the district court did not in fact conduct *de novo* review in the absence of objections; (2) the mere fact that the district court adopted the report before the objections were filed did not warrant the presumption that the court adopted the report without *de novo* review; (3) the district court has authority to review and adopt the magistrate's report without objections; (4) meaningful review of the report was possible notwithstanding the filing of objections; and (5) the appellants could have filed objections after the adoption by post-judgment motions. *Id.* at 732. The district court in this action may have erred by adopting the report before objections were filed, but under *McGill* Appellants suffered no prejudice because the district court expressly stated it performed *de novo* review, Appellants nevertheless filed their objections, and the district court reviewed and overruled such objections shortly thereafter.

Finally, Appellants' argument that the referral is inconsistent with "the statutory scheme of *de novo* review" under § 157(c)(1) is likewise unconvincing. It is clear that a district court may not refer an appeal from a bankruptcy court in a core-proceeding under § 158 to the magistrate for decision. *See Minerex Erdoel, Inc. v. Sina, Inc.*, 838 F.2d 781, 786 (5th Cir.), *cert. denied sub nom. Baker, Smith & Mills v. Minerex Erdoel, Inc.*, 488 U.S. 817 (1988). However, unlike a § 158 appeal, which is a final decision by the bankruptcy court, this action involves a bankruptcy court's non-final *report* to the district court pursuant to § 157. The district court satisfied § 157(c)(1)'s requirements by performing *de novo* review, adopting the report, and eventually entering a final judgment. Importantly, the district court did not refer the *bankruptcy court*'s findings and conclusions to the magistrate; it referred Appellants' *post-judgment motions* to the magistrate for *recommendation*, not

8

decision. *Minerex* forbids the referral of § 158 appeals to magistrates for decision, and does not address whether district courts could refer post-judgment motions to magistrates even if they concerned the report of a bankruptcy court. While we note that such motions should be decided without reference, we cannot conclude that the district court's actions in this action amount to reversible error.

B.

Appellants next raise numerous arguments challenging the district court's judgment imposing ERISA fiduciary liability. We review the findings and conclusions concerning ERISA fiduciary liability under multiple standards: findings of fact are reviewed for clear error, conclusions of law are reviewed *de novo*, and mixed decisions of fact and law are reviewed by combining the two standards to review factual components for clear error and legal components *de novo*. *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir. 1995). Under Rule 52(a) we may not reverse findings of fact if they are plausible in light of the record viewed in its entirety, and may not substitute our own view of such findings because we must give due regard to the trial judge's unique ability to assess the record. *Varity Corp. v. Howe*, 116 S. Ct. 1065, 1071 (1996); *Lancaster*, 55 F.3d at 1044. However, legal conclusions are subject to our plenary review and are not entitled to such deference. *Id.*

Under ERISA § 409(a), 29 U.S.C. § 1109(a):

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach. . . .

A "fiduciary with respect to a plan" is defined as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan

9

or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

§ 3(21)(A), 29 U.S.C. § 1002(21)(A). The term "fiduciary" is liberally construed in keeping with the remedial purpose of ERISA. *Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the United States*, 841 F.2d 658, 662 (5th Cir. 1988). "The phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control." *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1459-60 (5th Cir. 1986), *cert. denied*, 479 U.S. 1034, 1089 (1987). However, "'fiduciary' should be defined not only by reference to particular titles, . . . but also by considering the authority which a particular person has or exercises over an employee benefit plan." *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984).

1.

The BT Appellants principally argue that the bankruptcy court erroneously imposed *per se* ERISA fiduciary liability for implementing the Gibraltar loan and notifying Gibraltar that they would not further invest in Debtor because such actions did not involve plan assets. They argue that Debtor's accounts receivable are not plan assets, but assets pledged to Gibraltar under the loan. They also argue that because the loan and the decision not to further invest in Debtor were perfectly normal business decisions, they cannot be held liable even if such decisions had a collateral effect on the plans. They claim that upholding their liability would result in *per se* ERISA fiduciary liability for all lenders and borrowers of asset-based loans.

While we do not believe that negotiating and implementing the loan or communicating the decision not to further invest in Debtor *ipso facto* violated fiduciary duties, we agree with the

10

bankruptcy court that the BT Appellants ultimately exercised authority or control respecting management or disposition of plan assets to make them fiduciaries. ERISA does not define "plan assets" but the Secretary of Labor defines it to include amounts "that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." 29 C.F.R. § 2510.3-102 (2000). Other courts have similarly defined the term to "include employee contributions to benefit plans which are withheld from employees' paychecks and for deposit into their benefit plans, even though the contributions have not actually been delivered to the benefit plan." *United States v. Grizzle*, 933 F.2d 943, 946 (11th Cir.), *cert. denied*, 502 U.S. 897 (1991); *L.W. Cochran v. Coleman (In re Coleman)*, 231 B.R. 393, 395 (S.D. Ga. 1999); *In re College Bound, Inc.*, 172 B.R. 399, 403 (S.D. Fla. 1994); *Prof'l Helicopter Pilots Ass'n v. Denison*, 804 F. Supp. 1447, 1453 (M.D. Ala. 1992); *Pension Benefit Guar. Corp. v. Solmsen*, 671 F. Supp. 938 (E.D.N.Y. 1987).

The bankruptcy court correctly concluded that the November and December 1995 contributions were plan assets over which the BT Appellants exercised authority or control respecting their management or disposition to render them fiduciaries under ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). The BT Appellants wrongly focus on the pledge of accounts receivable and the decision not to further invest in Debtor as absolving them of liability. Those facts are less important than the fact that the BT Appellants relinquished control over Debtor without allocating the contributions to the plans, leaving the management or disposition of such contributions to be determined by Gibraltar. Such action managed or disposed of plan assets by causing them to be used by Gibraltar pursuant to the loan's terms. The BT Appellants' complaint of the lack of any "res" of

11

cash reflecting payroll deductions actually transferred to Gibraltar is irrelevant because it is

undisputed that Appellees' contributions were withheld but not applied to the plans.  The fact that

there was no physical transfer of amounts from the BT Appellants to Gibraltar is simply the result of

the very financing agreement the BT Appellants established, and does not undermine the bankruptcy

court's conclusion.[2]

We are unpersuaded by the BT Appellants' reference to *LoPresti v. Terwilliger*, 126 F.3d 34,

39 (2d Cir. 1997), in their effort to avoid liability.  In *LoPresti* the Second Circuit held that a co-

owner/officer (Donald LoPresti) of a closely held corporation who commingled employee

contributions with corporate assets in a general account and using that account to pay creditors, but

not the plan's trust fund, was a fiduciary by exercising authority or control respecting disposition of

plan assets.  *Id.* at 40.  The court did not hold the other co-owner/officer (John LoPresti, Donald's

brother) liable because he was "primarily" a "production person" who had only general knowledge

of employee contributions and with no responsibility for determining which creditors would be paid

---

[2] We reiterate that the "lockbox" financing arrangement was not in and of itself *per se* violative of ERISA.  However, the arrangement became problematic because of BT Appellants' conscious decision to allow ERISA plan assets which rightly belonged to plan members (and which were supposed to be used for the benefit of those members) to be used for the benefit of the company.  Thus, the source of liability for the BT Appellants is actually two-fold: (1) negotiating, implementing, and operating the "lockbox" financing arrangement with Gibraltar; and (2) devising and utilizing a payroll system where the withheld contributions, i.e. the ERISA plan assets, were not immediately applied to a separately segregated trust account but were instead only paid to the plans after funds were received from Gibraltar pursuant to the revolving line of credit made part of the "lockbox" financing arrangement.  These two factors paved the way for BP Appellants to unlawfully use general assets to pay other creditors (Gibraltar included) prior to paying the plans, thereby improving their financial position at the expense of the plan members.  As mentioned previously, BT Appellants used the December 1995 advances to pay other creditors and shortly thereafter relinquished all control over plan assets to Gibraltar - without first fully funding the 401(k) and health insurance plans.  In our view, the BT Appellants' course of conduct demonstrates that it used ERISA plan assets to further its own interests at the expense of and to the detriment of the plan members.  Therefore, this is a classic, albeit unconventional, case of breach of fiduciary duty.

12

or in what order, notwithstanding the fact that he too had check-signing authority. *Id.* at 40-41. The BT Appellants analogize their actions to John LoPresti's because they argue that they did not use Debtor's account to pay creditors other than Appellees' plans, and because there was no cash to allocate to the plans, but this argument is unconvincing. In light of the record, we do not believe that the BT Appellants were "primarily production persons" like John LoPresti with no responsibility for determining which creditors would be paid. In fact, Dworkin testified that if he told Villano to pay health claims before paying other vendors, Villano would have done so because Dworkin represented the BT Appellants, "who ultimately can make such demands." 8 Supp. R. at 2215-16. Ullman at his deposition testified that the BT Appellants as shareholder owned and controlled the assets and was ultimately responsible for the plans, but at trial he made an inconsistent statement that the "shareholder" was Gibraltar, even though Gibraltar was the lender, did not own any shares in Debtor, and controlled Debtor's assets after the BT Appellants relinquished control. *Id.* at 2326-40. Moreover, the fact that Debtor ran out of cash is irrelevant because Debtor's other accounts payable were paid, but Appellees' contributions and health claims weren't. In light of such testimony, we believe that the BT Appellants' actions were more akin to Donald LoPresti's actions because their actions disposed of plan assets by effectively delivering them to Debtor's primary creditor, Gibraltar. *See LoPresti*, 126 F.3d at 40; *see also Yeseta v. Baima*, 837 F.2d 380, 386 (9th Cir. 1988) (concluding that an employee who loaned an officer money from a benefit plan was a fiduciary for exercising authority or control over disposition of plan assets); *Connors v. Paybra Mining Co.*, 807 F. Supp. 1242, 1246 (S.D. W. Va. 1992) (holding that officers and directors were fiduciaries by using withheld employee contributions to cover company expenses), *appeal dismissed*, 21 F.3d 421 (4th Cir. 1993).

13

Appellants' attempt to blame Gibraltar as controlling plan assets is disingenuous. Whether the plans could have been funded with advances from Gibraltar in December 1995 was disputed, but the bankruptcy court did not clearly err in finding that Ullman and Villano had the ability to authorize the funding with such advances. Villano testified that when the BT Appellants relinquished control to Gibraltar, Gibraltar refused to fund the 401(k) plan. 10 Supp. R. at 3108. Harvey Mackler of Gibraltar testified to the contrary that Gibraltar did advance sufficient funds for the plans, and that Debtor's management ultimately controlled how the advances would be applied to its accounts payable. 1 Mackler Depo. at 101-08. Ullman and Villano had check-signing authority and authorized payments for Ullman's salary and personal expenses as well as Debtor's vendors, even though Appellees' contributions were not forwarded to the plans. Ullman testified that he had ultimate responsibility for the plans and he delegated that responsibility to Villano. 8 Supp. R. at 2315, 2358, & 2442. In light of such evidence, and with due deference to the bankruptcy court's factual findings, we cannot say that the bankruptcy court clearly erred in rejecting Appellants' attempt to blame Gibraltar. We also disagree with Appellants' suggestion that Appellees' allegation in their complaint, as well as the bankruptcy court's conclusion, that Gibraltar controlled plan assets after Debtor surrendered its collateral somehow absolves Appellants' of liability. Even if we were to conclude that Gibraltar also controlled plan assets to be deemed a fiduciary under § 3(21)(A)(i), Appellants' fiduciary status would not be negated. At a minimum, both Appellants and Gibraltar may be fiduciaries.

We also find unpersuasive Appellants' argument that since the loan was an ordinary "business decision," any collateral impact on ERISA plans cannot create fiduciary liability as a matter of law. A "business decision" free from ERISA liability is a conclusion based on relevant facts, and a

14

particular act or omission is not a business decision by simply labeling it as such. *See Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001). By advancing this argument, we are unsure whether the BT Appellants are admitting that Debtor's employees were the BT Appellants' employees, but regardless of such admission, to focus on whether the Gibraltar loan is a business decision is misplaced because the critical issue is whether any Appellant exercised authority or control respecting management or disposition of plan assets. ERISA fiduciary status is not contingent on whether a particular act or omission is unusual or abnormal. It is sufficient if a person or organization is covered by § 3(21)(A). *See Lancaster*, 55 F.3d at 1050 (explaining that parties may be "found to have stepped into the role of ERISA fiduciary.").

Appellants' claim that the bankruptcy court's conclusion subjects all lenders and borrowers of asset-based financing arrangements to ERISA fiduciary responsibilities is without merit. As we stated above, there is nothing inherently wrong with such financing arrangements, and we do not see how our conclusion could negatively affect their continued use. Our conclusion is limited to this action's facts, which include a non-existent entity named as the 401(k) plan administrator, the lack of a trust account for the health plan, the lack of any written plan or summary plan description of the health plan, Appellants' inability to identify a properly designated plan administrator (much less a properly designated fiduciary), their surrender of control over Debtor even though employee contributions were withheld from paychecks and health claims were unpaid, and their payment of other accounts payable while failing to forward such contributions to the plans. In light of these facts, we cannot conclude that Appellants' actions were simply business decisions having a collateral effect on ERISA plans. Moreover, Appellants' attempt to blame Gibraltar as exclusively "controlling" the disposition of plan assets confirms the weakness of this argument because, on one hand, Appellants

15

allege that lenders of asset-based-financing agreements will be subject to *per se* ERISA fiduciary status, yet on the other hand they contradict themselves by arguing later in their brief that only Gibraltar as lender should be liable for controlling plan assets for its refusal to fund the 401(k) plan. Appellants cannot have it both ways.[3] *Cf. Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) ("Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control.").

2.

The Officer Appellants also raise various arguments against the bankruptcy court's findings and conclusions. They argue that the bankruptcy court erred by concluding that they breached their fiduciary duty by failing to correct the terms of the Gibraltar loan to protect plan assets, by holding them liable for failing to issue a written health plan although no damages occurred as a result of such conduct, and by concluding that they were "plan administrators" or "employers" under ERISA.

We agree with the first argument and conclude that the bankruptcy court erred by holding the Officer Appellants liable for failing to correct or modify the Gibraltar loan's terms to ensure adequate funding of plan assets. As noted above, the loan itself is not problematic. Moreover, the bankruptcy court offered no authority for such conclusion, and we cannot find any. Also, while modification of the loan's terms could have ensured adequate funding of plan assets, we cannot hold the Officer Appellants liable for not doing so because they had no such power, and they assumed their duties long after the loan was implemented. *Cf.* ERISA § 409(b), 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was

---

[3] Relatedly, we express no opinion on whether a lender like Gibraltar who refuses to fund ERISA plans when in possession of Debtor's assets is subject to fiduciary duties. It is sufficient to note that Gibraltar is not before the court due to a settlement with Appellees for $100,000.

16

committed before he became a fiduciary or after he ceased to be a fiduciary."). Thus, we vacate that conclusion.

However, such result doesn't absolve the Officer Appellants of liability because the bankruptcy court correctly concluded that they were fiduciaries when they exercised authority or control respecting management or disposition of plan assets by using advances from Gibraltar in December 1995 for other accounts payable rather than the plans. Gibraltar advanced over $300,000 to Debtor after December 15, 1995. It was disputed whether Ullman and Villano had the ability to use the advances to fund the plans, but we cannot conclude that the bankruptcy court clearly erred in finding that they had such ability. While Villano testified that Gibraltar expressly refused to fund the plans, Mackler testified that Debtor's management ultimately controlled how such advances would be spent. Ullman and Villano had check-signing authority, and Dworkin testified that Villano would have paid the health claims if he were asked to do so. Instead of funding the plans, they paid other accounts payable, including Ullman's salary and business expenses, and other vendors. Therefore, they exercised authority or control respecting management or disposition of plan assets by paying other accounts receivable rather than the plans. *See LoPresti*, 126 F.3d at 40; *Connors*, 807 F. Supp. at 1246.

In addition, contrary to the Officer Appellants' arguments, we conclude that they were "plan administrators" and "employers" as defined by ERISA § 3(16), 29 U.S.C. § 1002(16), which provides in pertinent part:

> (A)     The term "administrator" means--
> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
> (ii) if an administrator is not so designated, the plan sponsor; or
> (iii) in the case of a plan for which an administrator is not designated

17

and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

(B)     The term "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer. . . .

In this action, there is no evidence of anyone being designated as administrator for the health plan, the 401(K) plan designated a non-existent entity as administrator, and the Secretary has prescribed no regulations designating any person as plan administrator, and hence, the above definition operates to identify the "plan sponsor," or "employer" as administrator of the plans. The nominal employer in this action was Debtor, but our analysis doesn't stop with Debtor because ERISA further defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." ERISA § 3(5), 29 U.S.C. § 1002(5).

While we agree with the Officer Appellants that the bankruptcy court may have erroneously assigned *per se* "administrator" status to them based on their role as officers, the record clearly reveals that the Officer Appellants did nonetheless satisfy that definition. The bankruptcy court erroneously stated that "[t]he employer acts here through its chief executive officer and its chief financial officer," R. at 101, because the mere status as an officer or director does not, *ipso facto*, result in ERISA fiduciary status. *Sommers Drug Stores*, 793 F.2d at 1459-60. However, the Officer Appellants *did* act at least "indirectly in the interest" of Debtor, if not directly as Appellees' employer, in relation to the plans. Ullman and Villano, as Debtor's board and operating committee members, approved of a new health plan. Both had check-signing authority for Debtor—apparently the only individuals with such authority except for Tony Mendoza, Debtor's comptroller, who was under Villano's supervision. Ullman testified that he and Villano were ultimately responsible for the plans, he delegated plan administration to Villano, and assumed that Villano was administering the plans.

18

Villano, as acting CFO, managed Debtor's finances and was the only Appellant who offered detailed testimony on the plans' operation. He was the third-party administrator's contact for health claims, and approved payment of such claims from Debtor's account. Dworkin testified that he believed Villano had discretion to handle employee-benefit issues, and told Villano to "take care of the employees" when Villano informed him that Debtor could not meet payroll. These facts confirm that the Officer Appellants acted at least indirectly in the interest of Debtor in relation to the plans to render them plan "administrators." *See McDowell*, 125 F.3d at 961 (holding that a shareholder of separately-incorporated corporations who obtained insurance for the corporations' employees, received questions on health-care coverage, and made decisions regarding the plan on behalf of the corporations was an ERISA "employer."). Moreover, such facts support the conclusion that the Officer Appellants were fiduciaries for having "any discretionary authority or discretionary responsibility in the administration" of the plans. ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). They do not suggest that they merely had ministerial responsibility in the management or administration of the plans. Therefore, we modify the bankruptcy court's conclusion respecting the Officer Appellants' fiduciary status.

We do agree with the Officer Appellants' next argument that the bankruptcy court erred by concluding that they breached their fiduciary duty by failing to issue a written health plan, or a summary plan description, pursuant to ERISA § 101, 29 U.S.C. § 1021. Section 502(c)(1), 29 U.S.C. § 1132(c)(1),[4] requires Appellees to make a request for such plan description before liability

---

[4] This section states in relevant part:

Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters

19

may be imposed, and Appellees did not make such a request. We disagree with the Officer Appellants' suggestion that liability may be imposed only if Appellees incurred damages. The plain language of § 502(c)(1)(B) does not require any showing of damages. Our decisions construing that section discusses "prejudice" that could be considered in determining whether penalties may be imposed. *See, e.g.*, *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 327 (5th Cir. 1992). Most importantly, the Officer Appellants misstate the record by claiming that it is uncontroverted that all "known" health claims were paid by the time Debtor closed, and that Ullman had nothing to do with the ongoing administration of the health plan. Villano himself testified to the existence of unpaid health claims, 9 Supp. R. at 2572, Ullman testified that he and Villano were ultimately responsible for the plans, and Appellants stipulated to the amount of unpaid health claims. Therefore, we vacate the bankruptcy court's conclusion imposing liability for the lack of a written health plan based not on the Officer Appellants' arguments, but on the lack of any request by Appellees pursuant to § 502(c)(1)(B).

3.

The BT Appellants next argue that the bankruptcy court erred by concluding that Ullman and Villano were the BT Appellants' agents. However, the bankruptcy court's conclusion on the purported agency relationship is unnecessary to establish BT Appellants' liability. BT Appellants are liable in this case because: (1) they were a fiduciary who exercised control over Appellees' plan assets pursuant to 29 U.S.C. § 1002(21)(A) ; and (2) "actively and knowingly participated" in the

reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

20

disposition of Appellees' plan assets.

In *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assur. Soc. of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988), we held that non-fiduciary respondeat superior liability attached under ERISA only when the principal "actively and knowingly" participated in the agent's breach. In the instant case, we express no opinion as to whether there was a principal/agent relationship and thus do not rest BT Appellants' liability on a theory of respondeat superior liability. However, we find it instructive to apply the "actively and knowingly" requirement to BT Appellants' conduct because the ultimate issue in any non-fiduciary respondeat superior theory of liability is virtually identical to a case such as this in which liability is directly predicated upon breach of the fiduciary duty to exercise proper control over plan assets. In the context of respondeat superior liability, the issue is whether the principal, by virtue of its de facto control over the agent, had control over the disposition of plan assets. Here, the issue is whether BT Appellants, as majority shareholder of the various corporations, had de facto control over Ullman and Villano's actions.

Despite the elaborate corporate structure which existed between Debtor, the Officer Appellants, and the BT Appellants, it is evident to us that BT Appellants had de facto control over Ullman and Villano's actions and actively and knowingly participated in their breach. The record demonstrates that BT Appellants acting through Dworkin told Villano to "make sure you take care of the employees." The undeniable implication of this statement is that Dworkin had the authority to make Villano fund the plans prior to paying off other creditors. Indeed, Dworkin specifically testified that Villano would have paid the health claims if he were asked to. The record further reveals that Dworkin and the BT Appellants knew that plan assets were not being properly forwarded, yet they failed to act because their equity value in Debtor was zero and because their "exit

21

strategy" had been automatically implemented by the Gibraltar loan. 8 Supp. R. at 2255. Since the loan already pledged Debtor's assets to Gibraltar, the BT Appellants apparently believed that they had no responsibility for Appellees' unfunded contributions—it was Gibraltar's problem. We disagree with that belief.

In sum, the bankruptcy court's factual finding that Dworkin and the BT Appellants had ultimate authority and control relating to the management or control of plan assets is not clearly erroneous. For the preceding reasons, BT Appellants are directly liable for breach of fiduciary duty under ERISA.

4.

The BT Appellants argue that the bankruptcy court improperly awarded attorney's fees. ERISA provides that "[i]n any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." § 502(g)(1), 29 U.S.C. § 1132(g)(1). We review an award of attorney fees under ERISA for abuse of discretion. *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). In conducting such review we consider the following factors:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* No single factor is determinative, but "together they are the nuclei of concerns" guiding our review. *Id.*

22

The BT Appellants specifically assert that, while the bankruptcy court correctly determined that they did not act in bad faith and that they had the ability to satisfy an award of attorney fees, it erred by making an award because they were not liable, apparently the conduct to be deterred is the commonplace practice of asset-based borrowing or lending, and Appellees did not seek to benefit all participants and beneficiaries of an ERISA plan. Therefore, the BT Appellants argue that since only one of the *Bowen* factors—the ability to pay—points to an award of attorney's fees, the bankruptcy court abused its discretion.

We reject this argument and conclude that the bankruptcy court did not abuse its discretion in awarding attorney's fees. In light of our conclusion affirming the BT Appellants' liability, the first factor weighs in favor of the award notwithstanding any lack of bad faith because their actions were primarily responsible for Appellees' losses. The second factor—deterrence—also supports an award because the conduct to be deterred is not "apparently" asset-based borrowing or lending, but improper management or disposition of plan assets and improper management and administration of ERISA plans. Furthermore, even though Appellees did not represent all participants or beneficiaries of the plans, they constituted a substantial group of employees who did not receive their voluntary contributions and reimbursements for covered health claims. They did not present a "significant" legal question regarding ERISA itself, but they did present a significant question involving application of ERISA to unusual facts. The fifth factor also weighs for the award because Appellants' core argument that Appellees' contributions are not plan assets, and that Gibraltar exclusively controlled the assets, lacked merit. Therefore, the award of attorney's fees was not an abuse of discretion. However, we decline to exercise our discretion to award attorney's fees on appeal, and thus, Appellees' application for attorney's fees on appeal is denied.

5.

Finally, we agree with Appellants that the bankruptcy court erred by failing to make any finding or conclusion relating to Appellees' settlement with co-defendant Gibraltar. A non-settling co-defendant may obtain a credit against a judgment by showing that the damages against him have been in fact and in actuality been previously covered. *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1340 (5th Cir. 1995). Appellees settled their claims with Gibraltar for $100,000, but there is nothing in the record indicating how such settlement affects Appellees' recovery of damages against Appellants, except for the bankruptcy court's statement that Appellees "have not been made whole." R. at 81. Therefore we must remand to the district court for a decision on whether such settlement amount, if any, should be credited to the judgment entered against Appellants.

III.

In light of the foregoing, we affirm in part, vacate and modify in part, the judgment of the district court. Appellees' application for attorney's fees on appeal is denied. We also remand to the district court, not to the bankruptcy court, for a determination on whether Appellees' recovery from Gibraltar should be credited to the amount of damages assessed against Appellants, and for any further proceedings consistent with this opinion.

24

EMILIO M. GARZA, Circuit Judge, specially concurring:

I concur in the majority's conclusion that the BT Appellants breached a fiduciary obligation under ERISA. I write separately to clarify which of the BT Appellant's actions gave rise to liability. I also write to clarify the relationship between respondeat superior and fiduciary liability under ERISA.

The BT Appellants are liable under ERISA because the "lockbox" arrangement they negotiated had the effect of transferring "plan assets")) in this case, amounts in the general assets of the Debtor belonging to the plans)) to a secured creditor of the Debtor instead of the plans. At least two other courts have held that deducting employee contributions to plans from paychecks, and then paying creditors out of the general assets of the company instead of meeting the obligations to the plans, violates the fiduciary duty provisions of ERISA. *LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997); *Connors v. Paybra Mining Co.*, 807 F. Supp. 1242 (S.D. W. Va. 1992). Department of Labor regulations define amounts withheld from employee paychecks to reflect contributions to plans as "plan assets." 29 C.F.R. § 2510.3-102(a).[5] By paying creditors out of the general assets of the

---

[5]BT contends that, by the terms of the Department of Labor regulation, the "amounts deducted from employee paychecks" do not become plan assets until "the earliest date on which such contributions can reasonably segregated from the employer's general assets." 29 C.F.R. § 2510.3-102(a). If this interpretation of the regulation were correct, we would have to remand to the district court for it to determine the "reasonable date" for segregation, and the BT Appellants would only be liable to the extent that assets were transferred under the lockbox arrangement from the Debtor to Gibraltar after that date.

The BT Appellant's interpretation is not correct. The correct interpretation is that the regulation provides that the amounts deducted from employee paychecks are plan assets immediately, but companies have a grace period before segregating the deductions from their general funds. *See U.S. v. Corace*, 146 F.3d 51, 53 (2d Cir. 1998) (referring to the regulation as a "grace period between the deduction of employee contributions and their deposit into a plan"). The text of the regulation reads: "the assets of the plan include amounts . . . that a participant has withheld from his wages by

-25-

company instead of segregating the amounts belonging to the plans, the defendants in these cases "exercised control" over plan assets, making them fiduciaries under ERISA. 29 U.S.C. § 1002(21)(A) (defining "fiduciary" as a person who "exercises any authority or control respecting management of [the plan's] assets"). Using the plan assets to pay creditors instead of segregating the assets into a separate fund breaches a fiduciary duty because it uses the plan assets for the benefit of the company instead of the benefit of the plan. 29 U.S.C. § 1104(a)(1) (requiring a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries").

The "lockbox" arrangement negotiated by the BT Appellants meant that a creditor of the Debtor, Gibraltar, would be paid first out of the general assets of the company, even though a portion of those assets belonged to the plans. The BT Appellants therefore caused "plan assets" to be paid to a creditor instead of to the plans. This exercised control over "plan assets," making BT a fiduciary under ERISA, and breached a fiduciary duty by using the assets for BT's benefit instead of for the

---

an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." Under BT's interpretation the deducted amounts become plan assets *when* they can reasonably be segregated. The better reading, both grammatically and in terms of the purposes of the regulation, is that the deducted amounts are plan assets immediately *and* they are to be segregated as soon as reasonably possible. BT's interpretation gives employers an ability and incentive to borrow against the plans in the dying days of a company without any real prospect of returning the funds. As long as the fiduciary is able to spend all of its assets before the "reasonable date" roles around, it is not liable at all for the deductions it took from the plans. This cannot have been an intended result of the regulation. The Department of Labor could not have intended for companies to be able to borrow with impunity from qualifying plans so long as the company is able to exhaust all of its assets before the debts become due.

When companies deduct contributions from employee paychecks, those amounts are not loans to the company that it can use for any purpose until the loan becomes due. Those contributions are monies that have already been paid to the employees as compensation. The company is acting merely as a steward; holding the plan participants' property until the assets can be segregated into a separate fund. The company may not dip into the plan assets to use for its own purposes any more than it could dip into the private bank accounts of its employees to fund its shortfalls; once the contributions are withheld, the money no longer belongs to the company.

-26-

benefit of the plan participants.

The BT Appellants argue against attaching liability to the financing arrangement they negotiated because finding liability in these circumstances would deter "all asset-based financing involving accounts receivable financing." They contend that the "lockbox" arrangement is a "normal and customary" business arrangement that should not be deterred. BT's position is that lenders will not agree to a "carve-out" of their collateral in favor of possible ERISA obligations.

Either the creditors of a company, like Gibraltar, or plan participants will bear the risk of a company not being able to meet its obligations to both qualifying plans and creditors. When BT talks about creditors not being willing to "carve out" of its collateral, they are arguing that the plan participants, instead of creditors and by extension shareholders like BT who want to take advantage of cheaper financing, should bear the risk. This would be contrary to the essential purposes of ERISA, which is to protect plan participants and make sure that their contributions to the plans are used only for the plan's benefit. Plan participants' deductions should be used only to fund the plans, not as a subsidy to reduce the cost of capital for companies like BT.

The majority also correctly concludes that the BT Appellants are liable under ERISA by virtue of their control over how the $300,000 advanced from Gibraltar after December 15, 1995 would be spent. Although the money was advanced from Gibraltar to the Debtor, the trial court found that the BT Appellants, especially Dworkin, participated in the decision about how this money would be expended. ERISA defines anyone who "exercises any authority or control" over plan assets a fiduciary. The definition of "fiduciary" is phrased broadly: it extends to anyone who exercises "any" authority or control. We have therefore interpreted the term "fiduciary" liberally in the ERISA context. *Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y*

*of the U.S.*, 841 F.2d 658, 662 (5th Cir. 1988).  Here, even if the BT Appellants were not the persons formally vested by state law with the authority to dispose of the $300,000 advance, they nevertheless had some actual authority over how the Debtor would spend the funds.  The Debtor's officers, Ullman and Villano, answered to the BT Appellants.  Because the BT Appellants exercised control over Ullman and Villano, who had control over plan assets, the BT Appellants were fiduciaries under ERISA.

In my view, the majority's allusion to respondeat superior and the "active and knowing" requirement requires further explanation.  Holding a person vicariously liable for breach of fiduciary duty under ERISA involves a mix of federal and state law.  ERISA supplies the standard for breach of fiduciary duty and the source of liability.  State law determines who is vicariously liable and under what circumstances.  *See, e.g., id.* at 665 (applying Louisiana law to determine if a principal was vicariously liable for a breach of ERISA by its agent).  We have also added an additional, federal requirement to vicarious liability under ERISA: the principal must be an "active and knowing" participant in the agent's breach.  *Id.*

The "active and knowing" requirement means that respondeat superior will rarely do any heavy lifting in the ERISA context.    Remember that ERISA makes anyone who "exercises any authority or control" over plan assets directly responsible as a fiduciary.  Whenever a principal "actively" participates in an agent's decision about how to use plan assets, he will, by virtue of his control over the agent's actions, also be exercising a degree of control over the assets themselves.  The "active and knowing" requirement therefore makes respondeat superior basically a non-issue.  The issue is only whether the principal, by virtue of its de facto control over the agent, also had control over the disposition of plan assets.

-28-

I agree with the majority that the relationship between the BT Appellants and the Officer Appellants resembles respondeat superior. The BT Appellants exercised control over plan assets by virtue of their de facto authority over Ullman and Villano, the two people who had the formal legal authority to dispose of the $300,000 advance. Assuming for the sake of argument that Ullman and Villano were not formally BT's agents under state law, Ullman and Villano responded to BT's authority just as agents typically respond to their principal's authority.

I would not give the phrase "active and knowing" the same prominence in this discussion as the majority chooses to give it, nor would I announce a new test for fiduciary liability under ERISA, as the majority seems to do. Although I agree that the situation here resembles respondeat superior, importing concepts from respondeat superior does not seem to provide any particular analytical value. The question in my mind is simply whether the BT Appellants exercised control over how the $300,000 advance would be spent. I agree with the majority that, on the facts as described by the trial court, the BT Appellants did exercise such control. As such, I agree that the BT Appellants are liable for using this advance to meet obligations of the Debtor other than those to the plans.

I therefore concur in the majority's opinion.